# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| ALL METRO GLASS, INC. | Civil No. 15-140 (JRT/JJK) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| TUBELITE, INC. | |
| Defendant. | |

Michael L. Brutlag, **BRUTLAG, HARTMANN & TRUCKE, P.A.**, 3555 Plymouth Boulevard, Suite 117, Minneapolis, MN 55447, for plaintiff.

Michael R. Carey, **BOWMAN AND BROOKE LLP**, 150 South Fifth Street, Suite 3000, Minneapolis, MN 55402, for defendant.

Plaintiff All Metro Glass, Inc. ("AMG") seeks to recover in contribution or indemnification from Defendant Tubelite, Inc. ("Tubelite") for the amount AMG paid to satisfy an 2014 arbitration award to the Independent School District 721 ("the District") for window remediation. AMG alleges Tubelite supplied defective window component materials – specifically, leading to shrinkage in the thermal break – that AMG installed at two of the District's schools in 2006, which resulted in water leakage at the schools in 2012, and prompted the schools' arbitration proceeding (in which Tubelite was not a party) against AMG in 2013. Tubelite counters that it only provided AMG with a limited warranty for its aluminum materials,[1] but that it conspicuously disclaimed any warranties

---

[1] AMG does not argue Tubelite breached its warranty for aluminum materials.

that could apply to the thermal break material.  Tubelite moves for summary judgment on AMG's claims and moves to exclude any product design or manufacture defect opinion testimony by AMG's experts.

Viewing the evidence in the light most favorable to AMG, the Court finds AMG failed to raise a genuine factual dispute that Tubelite was commonly liable to the District in contract or tort-based liability in support of AMG's contribution claim.   Additionally, pursuant to its indemnification claim, the Court finds AMG failed to raise a genuine factual dispute that it was faultless or played a secondary role for the water leakage at the schools.

Therefore, the Court will grant Tubelite's motion for summary judgment on AMG's claims for contribution and indemnification, and the Court will dismiss as moot Tubelite's motion to exclude AMG's expert witness testimony.

## BACKGROUND

## I.     FACTUAL HISTORY

AMG is a Minnesota corporation in the business of fabricating and installing glazing systems.  (Decl. of Michael R. Carey ("Carey Decl."), Ex. F ("McGrath Dep.") at 15:12-23, 21:2-6, Mar. 10, 2016, Docket No. 38.)  Tubelite is a Michigan corporation that manufactures and sells commercial window components.  (Decl. of Michael L. Brutlag ("Brutlag Decl."), Ex. A at 15:11-23, 33:21-23, Mar. 30, 2016, Docket No. 47.)  Tubelite's commercial window components include an interior and exterior frame joined by a thermal break or barrier to improve the thermal performance of the window system,

impede conductivity between the interior and exterior components, and prevent water leakage.  (*Id.* at 40:5-8; Brutlag Decl., Ex. D ("AAMA") §§ 1.0, 4.1.3.1.)

Thermal break shrinkage is the result of poor adhesion of the thermal barrier to the aluminum with which it is in contact.   (AAMA §§ 4.1.3-4.1.3.1.)   Shrinkage is problematic because the gap or void at the end of the thermal barrier material provides a path through which water can ultimately infiltrate into the wall cavity. (Carey Decl., Ex. H § 3.1.3.1, Mar. 10, 2016, Docket No. 38.)  According to a technical report authored by the American Architectural Manufacturers Association, thermal break shrinkage can be caused by a variety of factors, including the design or manufacture of the window systems, fabrication, job site storage and handling, and environmental impacts.  (AAMA §§ 4.2; 4.3.1; 4.3.2; 5.0.)

### A.     AMG's Sales Contract with Tubelite

On August 4, 2005, AMG entered into a construction contract with the District to perform glass and glazing work for two of the District's schools.   (Carey Decl., Ex. ("Arbitration Decision") at 2.)  That contract states, in relevant part:

> The Contractor [AMG] warrants to the Owner [the District], Construction Manager, and Architect that materials and equipment furnished under the Contract will be of good quality and new unless otherwise required or permitted by the Contract Documents, that the Work [labor and materials] will be free from defects not inherent in the quality required or permitted, and that the Work will conform with the requirements of the Contract Documents.

(Carey Decl., Ex. B §§ 1.1.3, 3.5.1.)  This warranty to the District was not limited to any duration of time.  (*Id.*)

The construction contract's performance specifications identified Tubelite as an acceptable window manufacturer and required AMG to obtain a 3-year warranty against defects from whichever window manufacturer it selected.   (Carey Decl., Ex. ("Arbitration Tr.") at 180:19-181:12; Carey Decl., Ex. E § 1.09.)  This manufacturer warranty was supposed to cover defects for "leakage or air infiltration" for a period of three years.  (Carey Decl., Ex. E § 1.09.)

On December 13, 2005, Tubelite issued AMG a price quotation to supply materials for the job.  (Decl. of Paul Kitching ("Kitching Decl."), Ex. A, Mar. 30, 2016, Docket No. 46.)  The quote noted: "Tubelite has provided their standard two (2) year warranty on this (these) unit(s) for material and workmanship only.   Warranty on installation to be provided by customer (installer)." (*Id.* at 1.)  The quote also stated: "ACCEPTANCE HEREOF IS EXPRESSLY LIMITED TO ACCEPTANCE OF THE TERMS AND CONDITIONS APPEARING ON THE FRONT AND REVERSE SIDE HEREOF . . . ." (*Id.* at 4.)  On the same date, AMG issued its purchase order accepting the quote.  (Kitching Decl., Ex. B.)

On three later occasions in 2006 – January 17, March 21, and May 18 – Tubelite issued quotes or worksheets and AMG issued corresponding purchase orders for materials necessary to finish the job.  (Kitching Decl., Ex. C- H.)  Several of Tubelite's quotes and worksheets displayed the word, "[d]ependable."  (Kitching Decl., Ex. A, C, E, and I.)

**B.      Tubelite's Limited Warranty to AMG**

On June 26, 2006, about six months after AMG accepted Tubelite's first quote,

Tubelite sent AMG a written limited warranty.  (Decl. of Ron Schaaf ("Schaaf Decl."),

Ex. 1 ("Tubelite's Limited Warranty"), Mar. 10, 2016, Docket No. 34.)   Tubelite's

Limited Warranty provides, in pertinent part:

> A.      If any of the aluminum materials (the "Products") furnished
> by Tubelite Inc. ("Tubelite") that have been properly installed and not
> subject to abuse or misuse prove to be defective (as defined below) within
> 2 years from the date of shipment, then Tubelite will, at its option, repair or
> replace the defect, or pay the reasonable cost of repair or replacement for
> the defect, provided that notice of the defect is given to Tubelite within 30
> days after discovery of such defect by Purchaser. . . .
>
> . . . .
>
> DISCLAIMER:    LIMITATION    OF    LIABILITY.    THE
> WARRANTIES STATED HEREIN ARE IN LIEU OF ALL OTHER
> WARRANTIES, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE.
> TUBELITE MAKES NO WARRANTY OF MERCHANTABILITY OR
> FITNESS FOR A PARTICULAR PURPOSE.

(*Id.*)  Other than aluminum materials, Tubelite's Limited Warranty does not mention any

other materials, such as thermal barrier materials.  Despite the District's performance

specifications, AMG did not obtain from Tubelite the required 3-year manufacturer

warranty against defects for "leakage or air infiltration."

**C.      The District's Arbitration Award Against AMG**

AMG's work for the District was certified as substantially complete in October

2006.  (Arbitration Decision at 6.)  However, in July 2008, the District's consultant,

Encompass, Inc. ("Encompass") reported water leakage concerns relating to the window

frames, but did not identify any thermal break issues.  (*Id.*; McGrath Dep., at 100:2-13.)

At the District's request, AMG repaired those window frames.  (Arbitration Decision at 6.)

Nevertheless, despite AMG's 2008 repairs, window leaks continued from 2009 to 2012.  (*Id.* at 6-7.)   After re-inspecting the work, in a 2012 report, Encompass identified shrinkage in the window thermal break materials.  (Carey Decl., Ex. H §§ 4.3-4.4.)   In April 2013, the District commenced an arbitration proceeding against AMG, arguing that AMG breached its warranty to provide materials and labor "free from defects not inherent in the quality required or permitted."   (Brutlag Decl., Ex. C; Arbitration Decision at 4.)   For purposes of the arbitration, the District and AMG stipulated Tubelite's windows were defective.  (Arbitration Decision at 8; Arbitration Tr. at 18:19-19:9.)   AMG countered at the arbitration that the District was liable for any defects in materials so long as AMG complied with performance specifications and that the District failed to mitigate its damages.  (Arbitration Decision at 12-16.)

In December 2014, the arbitrator found that AMG had breached its warranty to the District because the "[window] materials were not of 'good quality' " and "the 'Work' was not free from defects," and ordered that AMG pay an award of $607,000.00, to the District for costs of window repairs, and also ordered that AMG pay half of the arbitration costs and fees, amounting to an additional liability of $16,990.00.  (Arbitration Decision at 11, 20-21.)   In January 2015, AMG filed this action against Tubelite seeking indemnification or contribution of $624,490.00 for the arbitration award, costs, and fees AMG paid.  (Compl. at 4-6, Jan. 21, 2015, Docket No. 1.)

**D.     Expert Testimony Proffered**

In the present action, AMG offers the same expert reports that it offered in the underlying arbitration – one report prepared in 2013 by Richard Johnson of Construction Defect Consulting ("CDC") and two reports prepared in 2012 and 2014 respectively by various experts at Encompass, an engineering consulting firm.[2]  Tubelite disclosed a report prepared in 2015 by its expert, Kenneth Lies, an engineering architect, and AMG responded with a report prepared in 2015 by Johnson of CDC, as well as a report prepared in 2015 by various experts at Encompass.

In arbitration, AMG disclosed Richard Johnson of CDC as its construction failure expert.   (*See* Carey Decl., Ex. I.)   Johnson has participated in numerous forensic inspections to determine causes of water intrusion and damage.  (Carey Decl., Ex. U.)  In his 2013 report, Johnson opined that, "[w]ater leakage at windows in the two school buildings passed through gaps created by dry shrinkage of the thermal break urethane material," "[Tubelite's] manufactured material used to form the thermal break failed sometime after the expiration of the contract warranty period," and that "[n]o evidence has been presented that AMG's workmanship caused the shrinkage of the thermal break material."  (Carey Decl., Ex. I §§ 3.1, 3.7, 3.8.)

AMG also offered Encompass's 2012 report prepared by engineering consultants and forensic analysts Tim Schulz and Mark Blazevic for the District in the underlying

---

[2] AMG also provided to the Court an expert report prepared by Encompass in 2008 relating to the 2008 water leakage at the schools.  (Carey Decl., Ex. G.)  The 2008 water leakage is not relevant to the thermal shrinkage issue that prompted the District's arbitration proceeding against AMG in 2013 and is the subject of this action.

arbitration.  (Carey Decl., Ex. H.)  In that report, Schulz and Blazevic opined that in addition to thermal break shrinkage, water leakage resulted from AMG's faulty workmanship.  (*Id.* § 4.1.)  AMG also filed a supplemental 2014 report authored by Blazevic and Kent Jones from Encompass.  (Carey Decl., Ex. N.)  In their 2014 report, Blazevic and Jones referred to an American Architectural Manufacturers Association technical document, which states that multiple factors contribute to dry shrinkage, such as "contaminated bonding surfaces, design of the extrusion, distortion of the extrusion, resin type, and extrusion in cavity size."  (*Id.* at 1-2.)  Blazevic and Jones concluded that since all of those factors are associated with manufacturing of the system, the "[t]hermal break shrinkage, discovered during the course of our investigation in 2012, supports our opinion that the schools were provided a defective product that ultimately resulted in the observed water intrusion."  (*Id.* at 2.)

Tubelite subsequently disclosed the 2015 report of its expert architect, Kenneth Lies, for purposes of this case.  (Carey Decl., Ex. R.)  Lies opined that "[t]he cause of water intrusion at the windows is due to the failure to install the required sub-flashing below the windows.  The responsibility for the omitted required sub-flashing is not the responsibility of Tubelite, Inc. but AMG and others."  (Brutlag Decl., Ex. H at 12.)

In response, AMG filed a 2015 report authored by Johnson from CDC, which rebutted Lies's report and concluded that, "[w]ater intrusion was not the result of anything other than window frame thermal barrier shrinkage" and that "All Metro Glass assembled and installed the windows properly, in compliance with Tubelite instructions, applicable building codes and industry standards."  (Carey Decl., Ex. S §§ 4.3.1; 4.3.4.)

Johnson further opined that "Tubelite failed to design a thermal barrier system that was resistant to dry shrinkage.  This failure resulted in dry shrinkage of exceptional lengths in frame extrusions." [3]  (*Id.* § 4.3.5.)

AMG also filed a 2015 report from Encompass authored by Blazevic and Jones to rebut Lies's report, in which they concluded that, "[o]ur previously stated opinions about the condition of the windows and the cause of water intrusion are unchanged."  (Carey Decl., Ex. X at 2.)  Blazevic and Jones also challenged the way that Lies's report characterized their observations from their 2012 report.

None of these expert reports discussed or analyzed Tubelite's design or manufacturing process, or identified any of the factors associated with Tubelite's window components manufacturing or design that caused the dry shrinkage to occur.

## II.   PROCEDURAL HISTORY

AMG initiated this action on January 21, 2015 and seeks indemnification and contribution from Tubelite, claiming the damages it suffered as a result of the arbitration were entirely and primarily attributable to the defective materials supplied by Tubelite. (Compl. ¶¶ 23-30.)  Tubelite moves for summary judgment on AMG's claims and moves to exclude any product design or manufacture defect opinion testimony by AMG's experts.  (Mot. for Summ. J., Mar. 10, 2016, Docket No. 31; Mot. to Exclude Expert

---

[3] Tubelite argues that Johnson's 2015 rebuttal report is improper because it contains a new opinion as to Tubelite's product defect that was not contained in his 2013 report.  However, Johnson's 2013 report stated, "All Metro Glass installed a manufactured product.  The manufactured material used to form the thermal break failed sometime after the expiration of the contract warranty period."  (Carey Decl., Ex. I § 3.7.)  The Court understands this as Johnson's opinion that Tubelite's thermal break material was defective, and therefore, Johnson's 2015 rebuttal report properly relates to his previous opinion.

Test., Mar. 10, 2016, Docket No. 35.)  Tubelite contends AMG's expert testimony fails to prove a defect existed in the subject window components when they left Tubelite's control.  (*See generally* Def.'s Mem. in Supp. of Mot. to Exclude Expert Test., Mar. 10, 2016, Docket No. 37.)

## ANALYSIS

## I.  TUBELITE'S MOTION FOR SUMMARY JUDGMENT

### A.  Standard of Review

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Summary judgment is appropriate if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "To defeat a motion for summary judgment, a party may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue [of material fact] for trial."  *Davenport*

*v. Univ. of Ark. Bd. of Trs.*, 553 F.3d 1110, 1113 (8th Cir. 2009) (citing *Anderson*, 477 U.S. at 247-49).

### B.   Contribution and Indemnification

As a diversity action, this case is governed by state substantive law on contribution and indemnity.   *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).   Minnesota recognizes contribution and indemnity as variant remedies used to secure restitution. *Guillard v. Niagara Mach. & Tool Works*, 488 F.2d 20, 22 (8th Cir. 1973).   "Although similar in nature, they differ in the relief afforded."   *Id.*   "Contribution is appropriate where there is a common liability among the parties, whereas indemnity is appropriate where one party has a primary or greater liability or duty which justly requires him to bear the whole of the burden as between the parties."   *Hendrickson v. Minn. Power & Light Co*., 104 N.W.2d 843, 847 (Minn. 1960), *overruled on other grounds by Tolbert v. Gerber Indus., Inc.*, 255 N.W.2d 662 (Minn. 1977).

### 1.   Contribution

In Minnesota, a party suing for contribution must satisfy two threshold requirements: (1) the parties must share a common liability or burden, and (2) the party suing for contribution must have discharged more than his fair share of the common liability or burden.   *In re Westerhoff*, 688 F.2d 62, 63 (8th Cir. 1982).   "Common liability exists when two or more actors are liable to an injured party for the same damages, even though their liability may rest on different grounds."   *Guillard*, 488 F.2d at 22.   The first requirement – common liability – is crucial to success in a contribution action.   *Am. Auto.*

*Ins. Co. v. Molling*, 57 N.W.2d 847, 850 (Minn. 1953) ("The very essence of the action of contribution is 'common liability.' ").

Regarding the common liability requirement, the Court must determine whether Tubelite bears liability to the District in contract or tort for the thermal break shrinkage in Tubelite's window components.

### a.     Contract Liability

### i.     Tubelite's Warranty Disclaimer

Since the transaction at issue involved a sale of goods, the Uniform Commercial Code as adopted in Minnesota applies. *See* Minn. Stat. § 336.2-102. AMG contends that its sales contract with Tubelite was formed on or around December 13, 2005, when Tubelite issued its first quote and AMG accepted the quote by issuing a purchase order, pursuant to Minn. Stat. § 336.2-206(1)(a) ("[A]n offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances . . . ."). Tubelite does not offer any position on when its contract with AMG formed.

Typically, a price quotation is considered an invitation for an offer, rather than an offer to form a binding contract. *See Litton Microwave Cooking Prods. v. Leviton Mfg. Co.*, 15 F.3d 790, 794 (8th Cir. 1994) (applying Minnesota's Uniform Commercial Code); *W.H. Barber Co. v. McNamara–Vivant Contracting Co.*, 293 N.W.2d 351, 355 (Minn. 1979). A price quotation, however, may amount to an offer if it is sufficiently detailed and indicates that acceptance is all that is needed to ripen the offer into a contract. *See White Consol. Indus., Inc. v. McGill Mfg. Co.*, 165 F.3d 1185, 1190 (8th Cir. 1999)

(holding price quotation constituted a valid offer under Minnesota's Commercial Code for these reasons).

Tubelite's first price quotation expressly limited AMG's acceptance to the terms and conditions stated within the quote, and therefore AMG's assent to the quote was all that was needed to ripen Tubelite's offer into a contract. *See id.* Thus, the contract was formed in December 2005, when Tubelite issued its first quote and AMG accepted the quote.

Since the disclaimer of an implied warranty is an affirmative defense, Tubelite must establish that its Limited Warranty, which disclaimed all other warranties, was delivered at the time of the sale and constituted an integral part of the transaction. *See Dougall v. Brown Bay Boat Works & Sales, Inc.*, 178 N.W.2d 217, 222-23 (Minn. 1970); *see also BarclaysAmerican/Business Credit, Inc. v. Cargill, Inc.*, 380 N.W.2d 590, 591 (Minn. Ct. App. 1986) ("[A]n exclusive warranty, to exclude implied warranties, must be provided at the time of sale."). A "sale" is defined as, "the passing of title from the seller to the buyer for a price." Minn. Stat. § 336.2-106(1); *see also Gold'n Plump Poultry, Inc. v. Simmons Eng'g Co.*, 805 F.2d 1312, 1318 (8th Cir. 1986). Absent explicit agreement to the contrary, title generally passes upon physical delivery of the goods to the buyer. *See* Minn. Stat. § 336.2-401(2); *Gold'n Plump Poultry, Inc.*, 805 F.2d at 1318; *Johnson v. Bobcat Company*, No. 15-2097, 2016 WL 1258468 at *4 (D. Minn. Mar. 30, 2016) (holding that under Minnesota law, the time of sale generally occurs upon "physical delivery of the goods" to the buyer, and denying the seller's motion to dismiss the

buyer's breach of warranty claim because there was a factual dispute about whether the seller delivered a warranty disclaimer "at the time of sale").

Neither Tubelite nor AMG provided any information on whether, at the time of sale – when title of the goods passed from Tubelite to AMG – Tubelite delivered its Limited Warranty to AMG.  AMG contends that Tubelite's Limited Warranty was not binding because it was sent after their sales contract was formed in December 2005, and thus Tubelite is commonly liable to the District for furnishing defective goods as a breach of the implied warranties of merchantability and fitness for a particular purpose.[4] However, AMG's argument does not address whether Tubelite delivered its Limited

---

[4]AMG alternatively argues that, even if Tubelite's Limited Warranty applied, because that warranty describes "Products" as aluminum materials, any disclaimer language necessarily applies only to the aluminum products, not to the thermal break material.  Despite AMG's contention that Tubelite's Limited Warranty does not disclaim thermal barrier materials, the plain language of Tubelite's disclaimer does not reference "Products," and therefore is not confined only to aluminum materials.  Furthermore, in a similar case, the Eighth Circuit noted that a disclaimer of, "ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE" effectively disclaimed all implied warranties. *Transp. Corp. of Am. v. Int'l Bus. Machs. Corp.*, 30 F.3d 953, 959 (8th Cir. 1994).  Similarly, Tubelite's disclaimer of, "ALL OTHER WARRANTIES, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE.  TUBELITE MAKES NO WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE," aligns with the language in *Transport* and thus also effectively disclaims warranties on all materials other than what Tubelite expressly warranted – aluminum materials.  If Tubelite delivered its Limited Warranty to AMG at the time of sale, then Tubelite's disclaimer of any thermal break material warranty would extend to the District and relieve Tubelite of any contract-based liability to the District.

AMG also contends that Tubelite's representation that its goods were "dependable" gave rise to an express warranty as a description of the goods that made a part of the basis of the bargain, and therefore Tubelite also has a common liability exposure to the District as a breach of express warranty.  AMG's argument fails as a matter of law – courts have uniformly categorized the word "dependable" as mere puffery rather than an express warranty.  *See, e.g.*, *Avola v. La.-Pac. Corp.*, 991 F. Supp. 2d 381, 392 (E.D.N.Y. 2014) (stating general descriptions of the product, such as "most dependable," constitutes puffery); *Apodaca v. Whirlpool Corp.*, No. 13-725, 2013 WL 6477821, at *6 (C.D. Cal. Nov. 8, 2013) (statement that product is "dependable" is "too vague to be actionable").

Warranty at the time of sale, which would determine whether Tubelite's disclaimer of all other warranties was timely received and effective.

Tubelite contends that for the Court to determine whether Tubelite is commonly liable with AMG to the District for contract-based liability, the relevant inquiry is whether Tubelite's Limited Warranty extended to the District, not to AMG. All warranties, express or implied, as well as disclaimers of warranties, extend to third parties who may reasonably be expected to use the warranted goods. *See* Minn. Stat. § 336.2-318 ("A seller's warranty whether express or implied extends to any person who may reasonably be expected to use, consume or be affected by the goods and who is injured by breach of the warranty."); *Hydra-Mac, Inc. v. Onan Corp.*, 450 N.W.2d 913, 916 (Minn. 1990) (explaining that a third-party beneficiary of a warranty was "equally subject to any [effective] disclaimers of warranty"). Tubelite contends that the Eighth Circuit has held that under Minnesota law, a warranty disclaimer need not be delivered contemporaneously to a third party or end user with the sale in order to be binding on a third party or end user. *Transp. Corp. of Am.*, *v. Int'l Bus. Machs. Corp.*, 30 F.3d 953, 959 (8th Cir. 1994).

The instant action, however, is distinguishable from *Transport* because here the seller's warranty disclaimer does not apply to the purchaser – and thereby to the end user – if the seller did not deliver the disclaimer to the **purchaser** at the time of sale. Although the Court agrees that a seller need not provide a warranty disclaimer to a third party at the time of sale, nothing in *Transport* suggests that the seller need not provide the

disclaimer to the purchaser at the time of sale to render the disclaimer effective against the third party or end user.

Furthermore, the Court rejects Tubelite's argument that its Limited Warranty was incorporated by reference based on its language in its price quotation that its "standard two (2) year warranty" applied.[5]   Tubelite did not provide those warranty terms or disclaimer until Tubelite sent its Limited Warranty to AMG six months after the contract was formed in December 2005, when Tubelite issued its first quote and AMG accepted the quote.   Tubelite argues that *Osgood v. Medical, Inc.*, applies.   In *Osgood* the court determined that warranty exclusions were enforceable against the purchaser because the purchaser knew that the product came subject to the seller's "Special Terms."   415 N.W.2d 896 (Minn. Ct. App. 1987).   *Osgood* is distinguishable, however, because in

---

[5] Tubelite also argues that AMG already conclusively admitted the Tubelite Limited Warranty is applicable, based on AMG's response to Tubelite's Request for Admission Number 1:

> REQUEST FOR ADMISSION NO. 1. Admit the Limited Warranty attached hereto as Exhibit A is a true and correct copy of the Limited Warranty issued by Tubelite is applicable to the Projects.
>
> RESPONSE TO REQUEST NO. 1. Admit.

(Second Decl. of Michael R. Carey, Ex. AA at 2, Apr. 13, 2016, Docket No. 50.)

However, the Court also notes AMG's response to Tubelite's Request for Admission Number 2:

> REQUEST FOR ADMISSION NO. 2. Admit that there is no other warranty from Tubelite applicable to the Projects other than the Limited Warranty attached hereto as Exhibit A.
>
> RESPONSE TO REQUEST NO. 1. Deny.

(*Id.*)   The Court, therefore, understands that AMG did not admit that Tubelite's Limited Warranty was **effective**, but rather, AMG admitted that the Limited Warranty was applicable to the Projects but other implied warranties were also applicable to the Projects.

*Osgood*, the purchaser had many discussions with the seller over the applicability and scope of the seller's special terms and conditions before the purchaser typed the language on its order form that incorporated by reference the seller's special term and conditions. *Id.* at 899, 902.  In the instant action, there is no evidence that AMG knew of or discussed the relevant terms of Tubelite's Limited Warranty before its receipt.  Furthermore, it is Tubelite, rather than AMG, who attempts to incorporate by reference its own Limited Warranty terms.  Therefore, Tubelite's reliance on *Osgood* is inapposite.

A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita*, 475 U.S. at 587.  With no evidence to the contrary, the Court will assume that Tubelite's Limited Warranty was not provided to AMG at the time of sale, and therefore does not extend to the District.  In the absence of an effective disclaimer or exclusive warranty, the Court must determine whether Tubelite's goods breached the implied warranties in the Minnesota Uniform Commercial Code, thereby rendering Tubelite commonly liable with AMG to the District.

## ii.       Breach of Implied Warranty

The implied warranty of merchantability, Minn. Stat. § 336.2-314, and the implied warranty of fitness for particular purpose, Minn. Stat. § 336.2-315, apply in the absence of an effective disclaimer.  *See Cargill*, 380 N.W.2d at 590.  "The doctrine of implied warranty is favored by this court, and such warranties should be given effect when it is possible to do so." *Dougall*, 178 N.W.2d at 222 (citation omitted).

For goods to be merchantable, they must be "fit for the ordinary purposes for which such goods are used."   Minn. Stat. § 336.2-314(2)(c); *Driscoll v. Standard Hardware, Inc.*, 785 N.W.2d 805, 816 (Minn. Ct. App. 2010).   An implied warranty of fitness for intended use arises if a seller, at the time of a contract, has reason to know that the buyer has a particular purpose for the goods purchased, and the buyer relies on the seller's judgment or skill to select those goods.   Minn. Stat. § 336.2-315; *Driscoll*, 785 N.W.2d at 817.

There is no evidence or argument that the particular purpose for which Tubelite's window components were used was different than its ordinary use.   Hence, the two implied warranties merge.   *See, e.g., Cartillar v. Turbine Conversions, Ltd.*, 187 F.3d 858, 861 n.5 (8th Cir. 1999) (where "the particular purpose for which goods are to be used coincides with their general functional use, the implied warranty of fitness for a particular purpose merges with the implied warranty of merchantability").   The question, then, is whether there exists a genuine issue that the Tubelite's window components were not fit for its ordinary use.

Tubelite argues that AMG cannot demonstrate Tubelite's product breached an implied warranty of merchantability since AMG has not produced admissible testimony showing there was a product defect.   Tubelite contends that AMG's experts offer no actual design or manufacturing defect opinions, but instead merely conclude that Tubelite's product is defective based on the observance of dry shrinkage roughly six years after completion of the projects.

In asserting breach of an implied warranty of merchantability, "the plaintiff must show not only the breach but also a causal relationship between the breach and the loss sustained." *Int'l Fin. Servs., Inc. v. Franz*, 534 N.W.2d 261, 266 (Minn. 1995). "In an action based on breach of warranty, it is of course necessary to show not only the existence of the warranty but the fact that the warranty was broken and that the breach of the warranty was the proximate cause of the loss sustained.

> Several courts have indicated the importance of the element of causation. The result of this lack of proof is that an otherwise valid action for a breach of warranty will fail. . . .

> . . . Where the record shows that there are several possible causes of an injury, for one or more of which the defendant was not responsible, and it is just as reasonable and probable that the injury was the result of the latter, the plaintiff may not recover, since he has failed to prove that the defendant's breach caused the injury.

> [W]here the evidence is such that a jury can do no more than guess or conjecture as to which of several acts, conditions, or agencies, not all of which can be charged to defendant, was in fact the efficient cause, it is for the court to decide as matter of law that plaintiff's case has not been established.

*Heil v. Standard Chem. Mfg. Co.*, 223 N.W.2d 37, 42 (Minn. 1974) (citations omitted).

There is no evidence in the record that anything was wrong with Tubelite's window components except by reasoning backwards, *i.e.*, there was thermal shrinkage; therefore Tubelite's window components must have been defective. *See id.* (citing *Olin Mathieson Chem. Corp. v. Moushon*, 235 N.W.2d 263, 264 (Ill. App. Ct. 1968)).

AMG's experts, Blazevic and Schulz, noted in their 2012 report that testing performed on the school's windows, "clearly demonstrated the deficiency relative to thermal break shrinkage," was a result of "window manufacturing defects combined with

field installation deficiencies." (Carey Decl., Ex. H §§ 3.1.3.1; 3.1.4.) Blazevic and Schulz found, "[t]he shrinkage of the thermal breaks is the primary cause of moisture intrusion around storefront window openings at both buildings and indicates that the windows are not of good quality and are defective." (*Id.* § 4.4.) However, their report provided no discussion or analysis of how or why Tubelite's windows were not of good quality or defective.

Additionally, Blazevic and Jones's 2014 supplemental report cited to the American Architectural Manufacturers Association's ("AAMA") publication which discusses multiple manufacturing factors that contribute to dry shrinkage, such as contaminated bonding surfaces, design of the extrusion, distortion of the extrusion, resin type, and extrusion cavity size. Blazevic and Jones, however, do not identify, which, if any, of those causative factors applied to the schools. Moreover, Blazevic and Jones failed to consider other factors described in the AAMA publication such as fabrication, job site storage or handling, and environmental impacts, which are not attributable to Tubelite's design or manufacture, but may still cause dry shrinkage in thermal break material. By selectively citing to the AAMA publication for factors associated with manufacturing, yet ignoring other considerations in the same publication that are not associated with manufacturing, AMG failed to prove that Tubelite's alleged defective window components caused the water leakage at the schools. As the Minnesota Supreme Court held in *Heil*, a factfinder cannot be left to speculate whether or how a product is defective if the plaintiff fails to identify which factors caused the defect for a breach of warranty claim. *Heil*, 223 N.W.2d at 42.

AMG's remaining expert, Johnson, concluded in his 2013 report, "[Tubelite's] manufactured material used to form the thermal break failed" and that "[AMG] installed the Tubelite windows correctly." (Carey Decl., Ex. I §§ 3.7-3.8.) However, Johnson's report presents no analysis on how he reached the conclusion that Tubelite's manufactured material failed – instead, he merely states that, "the thermal break urethane material is the primary cause of current 2013 water intrusion" and "the manufactured material used to form the thermal break failed sometime after the expiration of the contract warranty period." (*Id.* § 3.7.) Furthermore, Johnson opines in his 2015 report:

> The sill receptors provided by Tubelite Inc. were defective however. Dry shrinkage of the thermal barrier material created bypasses for water accumulating in the receptors that did not emerge from the drilled weep holes in the outside edges of the receptors. . . . Tubelite failed to design a thermal barrier system that was resistant to dry shrinkage."

(Carey Decl., Ex. S §§ 4.2, 4.3.5.) The Court finds this to be backwards reasoning; Johnson uses the fact that dry shrinkage was observed at the schools to conclude that Tubelite's window components were defective. Johnson does not address what factors contribute to dry shrinkage other than product design, why Tubelite's design makes it susceptible to dry shrinkage, and what feasible alternative designs would resist dry shrinkage differently. He provides no analysis to how he reached his conclusion that Tubelite's design was defective.

Thus, even if Tubelite's Limited Warranty was not delivered to AMG at the time of sale, AMG's experts, pursuant to a breach of warranty claim, failed to raise a genuine dispute as to whether Tubelite's window components were defective and whether the water leakage at the schools was due to thermal shrinkage in Tubelite's window

components.   A factfinder cannot be left to speculate whether or how a product is defective.   The Court, therefore, finds that Tubelite is not commonly liable with AMG to the District for AMG's contribution claim as a matter of contract law.

### b.   Tort Liability

Notwithstanding that Tubelite bears no contract liability, the Court must also determine whether Tubelite owes any tort-based liability to the District, as required to establish a right to contribution.   A seller may be subject to a product defect tort claim if "a defect in the goods sold . . . caused harm to the buyer's tangible personal property other than the goods, or to the buyer's real property."   Minn. Stat. § 604.101, subd. 3. "'Goods' means tangible personal property, regardless of whether that property is incorporated into or becomes a component of some different property."   Minn. Stat § 604.101, subd. 1(b).

AMG contends Tubelite's goods caused harm to the District's real property within the meaning of the statute because "shrinkage of the thermal barrier in Tubelite's window components allowed liquid water, water vapor and air to pass through the void in the thermal barrier from the outside to the inside of the building.   In other words, the classrooms became drafty and wet."

However, the District's claim in the arbitration did not involve damage to its real property and the arbitration award was solely for window remediation.   "After consideration of the evidence, the preponderance of the evidence establishes that repairs should be performed at the Windows to resolve issues with the shrinkage of the thermal break material without full replacement."   (Arbitration Decision at 19.)   Neither the

arbitration findings nor the experts' reports described damage to the District's real property. In fact, AMG's expert, Johnson, stated in his 2013 report, "The wall structural components at both elementary schools are precast concrete panels. The concrete was not damaged by water. There is no structural damage to the buildings." (Carey Decl., Ex. I at 3.7.)

"To defeat a motion for summary judgment, a party may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue [of material fact] for trial." *Davenport*, 553 F.3d at 1113. There is no evidence to support AMG's mere allegation that Tubelite's goods caused harm to the District's real property. Thus, as the record establishes the only damage was to the goods themselves – the windows – Tubelite cannot be held liable to the District for a product defect tort claim.[6]

### c.   Fair Share of Liability

In the absence of either a valid contractual or tort-based theory of recovery, Tubelite cannot be commonly liable with AMG to the District. Thus, an analysis of the second element in a contribution claim, that AMG discharged more than its fair share of the common liability or burden, is moot because there is no common liability. The Court will grant Tubelite's motion for summary judgment on AMG's contribution claim.

---

[6] Although AMG states in its brief opposing summary judgment that, "Tubelite's common liability may be predicated upon negligence, breach of implied warranties or breach of an express warranty," (Pl.'s Mem. in Opp. to Def.'s Mot. for Summ. J. at 40, Mar. 30, 2016, Docket No. 44), AMG did not provide any briefing supporting or expressing its purported negligence claim. Thus, the Court treats AMG's negligence claim as waived.

### 2.  Indemnification Claim

Under Minnesota law, a party seeking indemnity must show an express contractual relationship or implied legal duty that requires one party to reimburse the other entirely. *Union Pac. R.R. Co. v. Reilly Indus., Inc.*, 215 F.3d 830, 841 (8th Cir. 2000).  The seminal case on indemnity in Minnesota is *Hendrickson v. Minn. Power & Light Co.*, 104 N.W.2d 843 (Minn. 1960). *overruled in part on other grounds*, *Tolbert v. Gerber Indus., Inc.*, 255 N.W.2d 362 (Minn. 1977).  In *Hendrickson*, the Minnesota Supreme Court found contract theory justifying indemnity to be too narrow in scope and adopted the modern view that "principles of equity furnish a more satisfactory basis for indemnity." *Id.* at 847.  However, the Court cautioned that "the situations in which [indemnity] is allowed are exceptional and limited." *Id.* at 848.  The Court proceeded to list the situations in which a joint tortfeasor may generally recover indemnity only in the following situations:

> (1) Where the one seeking indemnity has only a derivative or vicarious liability for damage caused by the one sought to be charged.

> (2) Where the one seeking indemnity has incurred liability by action at the direction, in the interest of, and in reliance upon the one sought to be charged.

> (3) Where the one seeking indemnity has incurred liability because of a breach of duty owed to him by the one sought to be charged.

> [(4)] Where there is an express contract between the parties containing an explicit undertaking to reimburse for liability of the character involved.

*Id.*[7]

---

[7] The *Hendrickson* court also identified a fifth situation in which indemnity could be appropriate: "[w]here the one seeking indemnity has incurred liability merely because of failure,

(Footnote continued on next page.)

AMG contends its indemnity claim against Tubelite fits within the first and third *Hendrickson* categories.  AMG argues that the first situation applies because its liability from installing windows derived from Tubelite's defective product.  *Tolbert*, 255 N.W.2d at 366 ("In cases under Rule 1, the liability of the party seeking indemnity is imposed upon him for the conduct of another.").  AMG also argues that the third situation in *Hendrickson* applies because AMG was without personal fault, but was exposed to liability because of Tubelite's failure to perform a duty it was contractually obligated to perform.  AMG argues its experts' opinions demonstrate that the District would not have suffered a loss but for a defect in Tubelite's thermal barrier materials.

Finally, AMG argues that *Sorenson v. Safety Flate, Inc.* is an instructive case.  216 N.W.2d 859 (Minn. 1973).  In *Sorenson*, the distributor of a product asserted an indemnity claim against the manufacturer when the plaintiff was injured by the product.  *Id.* at 860-61.  The manufacturer argued that the distributor was not entitled to indemnity because the distributor prepared and circulated an advertising flyer in which the distributor made an express warranty about the product.  *Id.* at 862-63.  The distributor argued that the flyer contained "no additional affirmations or promises beyond those which already were included in the implied warranty of merchantability which accompanied the product from the manufacturers."  *Id.* at 863.  The Minnesota Supreme Court held the distributor was entitled to indemnity from the manufacturer because the

_____

(Footnote continued.)

even though negligent, to discover or prevent the misconduct of the one sought to be charged." *Hendrickson*, 104 N.W.2d at 848.  The Minnesota Supreme Court overruled this portion of *Hendrickson* in *Tolbert*, on the basis that it allowed parties who were culpably negligent to avoid financial responsibility.  *Tolbert*, 255 N.W.2d at 367.

distributor's warranty, "essentially did nothing more than reiterate the guarantees already encompassed within the implied warranties which accompany any product produced by a manufacturer, i.e., that the product is fit for the ordinary purposes for which such goods are to be used." *Id.* As the Court already concluded that AMG failed to demonstrate that Tubelite has any contract or tort liability to the District, AMG's liability to the District cannot be derivative or vicarious from Tubelite. Thus, the first *Hendrickson* situation is inapplicable.

Furthermore, AMG's liability to the District does not fall within the third *Hendrickson* situation because, "a prospective indemnitee, who seeks to come within Rule 3 of *Hendrickson* by claiming that another party breached a duty, . . . must itself be faultless." *Nerenhausen v. Chi., Minneapolis, St. Paul & Pac. R.R. Co.*, 479 F. Supp. 750, 757 (D. Minn. 1979); *Tolbert*, 255 N.W.2d at 366 ("In situations covered by [*Hendrickson*] Rules 1, 2, and 3, the party who seeks indemnity has been held liable even though not personally at fault. . . . In cases under Rule 3, the party seeking indemnity is again without personal fault, but is exposed to liability because of the failure of another to perform a duty which he was legally or contractually obligated to perform." (footnotes omitted)).

AMG's expert reports suggest the water leaks were caused – at least in part – by AMG's faulty installation. For example, the 2012 Blazevic and Schulz report stated, "deficiencies associated with storefront window units and their installations are the source of ongoing leakage and deterioration." (Carey Decl., Ex. H § 4.1.) Thus, as AMG has not proven through its own experts that it was faultless in causing the water leakage

at the schools, AMG cannot prevail on a indemnification claim under *Hendrickson*'s third category.

Finally, *Sorenson* is distinguishable from the instant action because in *Sorenson* the Minnesota Supreme Court found that the distributors played a "secondary role" in the events leading to the injury. *Sorenson*, 298 Minn. at 360-61. The court noted the distributors did not "assemble, examine, test, or alter the product," whereas the manufacturers fabricated and directly shipped the product to the customer. *Id.* at 361. The court therefore held that the product did not perform as its manufacturers implicitly warranted that it would. *Id.*

However, in the present action, AMG clearly did not play a "secondary role" at the schools. Tubelite did not ship its window components directly to the schools – rather AMG was directly involved in assembling and installing Tubelite's window products at the schools. Furthermore, unlike *Sorenson*, AMG failed to prove that Tubelite's products breached its implied warranty of merchantability.

As the Court finds *Hendrickson* and *Sorenson* inapplicable to the instant action due to AMG's inability to prove it was faultless or played a secondary role for the water leakage at the schools, as a matter of law, Tubelite is not liable to AMG entirely for the arbitration award pursuant to AMG's indemnification claim.

The Court will therefore grant Tubelite's motion for summary judgment on AMG's claims for contribution and indemnification, and dismiss as moot Tubelite's motion to exclude AMG's expert witness testimony.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.    Tubelite's Motion for Summary Judgment [Docket No. 31] is **GRANTED**.

2.    Tubelite's Motion to Exclude Expert Testimony [Docket No. 35] is **DENIED as moot**.


**LET JUDGMENT BE ENTERED ACCORDINGLY.**


DATED:   December 30, 2016                    _____s/ John R. Tunheim_____
at Minneapolis, Minnesota.                           JOHN R. TUNHEIM
                                                                      Chief Judge
                                                         United States District Court